LANIER, Judge.
This is a suit for damages in tort which was filed on August 19,1977, claiming that Larry Charpentier was injured on the premises of Bourg Drydock & Service Co., Inc. in Terrebonne Parish on January 17, 1977, when he tripped on a piece of iron and twisted his knee. Answer was filed on September 23, 1977. The initial claim was for $55,500.00, but by two supplemental and amending petitions, the plaintiff increased his damage demands to $240,000.00 and, ultimately $945,000.00. This matter was tried and completed on August 14, 1979, and taken under advisement by the trial judge.
On May 14,1981, the trial judge rendered judgment in favor of the defendant and dismissed the plaintiff’s petition with written reasons. The trial judge held that the plaintiff’s testimony was unreliable and failed to establish that an accident occurred as alleged. In the alternative, the trial judge found that the plaintiff failed to prove the defendant was negligent by a preponderance of the evidence, and in the further alternative, held that if there was an accident as alleged by the plaintiff, that his claim was barred by his own contributory negligence. This devolutive appeal followed.
The version of what occurred given by the plaintiff at the trial is found at pages 70 and 71 of the transcript as follows:
*508 “Q Tell the Judge what happened.
A Well, we was walking, and I was looking, you know, talking at him, I was looking down. They had a lot of, you know, plate of iron, angle iron .. I was walking, talking, and all of a sudden, my foot .. I pushed it sideways, you know. And I said a curse word.
Q Did you hit your foot on anything?
A A piece of iron.
Q Were you watching where you were going?
A Yeah, I was watching.
THE COURT: What is the name of this employee who invited you to have coffee? What was his name?
THE WITNESS: Glenn Pellegrin.
THE COURT: Who?
MR. WEIGAND: Glenn Pellegrin.
THE COURT: And earlier, I missed the date of your birth. Could you give me that right now?
THE WITNESS: October 10th, 1938. THE COURT: Thank you.
BY MR. WEIGAND:
Q Now, Mr. Charpentier, did you fall down?
A Uh, stepped myself up, stumbled there.
Q You stumbled there?
A Yeah.
Q You did not fall to the ground?
A No.
Q Where was Mr. Pellegrin?
A Aside of me.
Q Aside of you?
A Yeah.
Q And you said you said a swear word?
A (No response)
Q Did you say anything?
A I just said it to myself.
Q And then what happened?
A And then we keep on walking to the office.
Q Were there any men working in the area?
A Yeah, they have some men working. Barge and different things.
Q What time of day was it?
A At 10:30 in the morning.
Q Sit down now, Mr. Charpentier. Was it raining, or how was the weather that day?
A That day was pretty weather, it was cold. The night before, it had rained, you know, it took a north wind, you know.
Q A northerner?
A Yeah.
Q That was the day before?
A Yeah.”
(Emphasis added).
At pages 107 and 108 of the trial transcript, the plaintiff further described the incident as follows:
“Q You said a curse word. Did you mention anything to Mr. Pellegrin?
A I said, ‘It look like I hurt my knee, my leg, you know.’ And I said a curse word; I don’t if he hear me or not.
Q Did you say directly to him that it looks like your hurt your leg?
A No, I don’t know if he hear me.
Q I’m asking you, did you say it to him?
A Yeah.
Q Did he acknowledge it; did he say anything to you?
A He said, ‘Just keep on walking.’ He told me.
Q He told you to keep on walking?
A Yeah.
Q Did you talk to anyone else at Bourg Drydock that day?
A No.

Q But you had no further discussions about your leg?
A Yeah, I told him it was bothering me.
Q When was this?
A I came back from that office.
Q Where were you when you told him this the second time?
A Hum?
Q Where were you when you said this the second time?
A We was by the trailer.
Q Was there anyone present at that time?
*509 A No.
Q Did you tell him that you’d like to report it to somebody?
A No. I thought it would go away.”
(Emphasis added).
The trial testimony of Glenn Pellegrin directly contradicts that of the plaintiff as evidenced by the following excerpt from page 137 of the transcript:
“Q Now, when you were walking with him in the shipyard, you say he was walking next to you or on the side of you?
A It was on the side of me, but it could have been slightly behind me.
Q Did you hear him curse at anytime when you were proceeding from the drydock to the office?
A No.
Q Did you hear him say anything?
A Not that I can recall.
Q Did he fall to the ground at anytime?
A I can’t say. I didn’t see him fall.
Q To your knowledge, you didn't see him fall?
A No, sir.”
(Emphasis added).
The testimony of the plaintiff at the trial is inconsistent with the testimony that he gave in his deposition taken on November 16, 1977. At page 17 of that deposition appears the following:
“Q Here let me retrace here. When you stumbled over the piece of iron, you say you didn't fall to the ground?
A No.
Q And did you continue to walk to the office?
A Yes.
Q Did you say anything about the incident to anyone?
A No.
Q Did you continue to work that day?
A I didn’t have any work. Just was waiting for the boat to pick it up, you know. No heavy stuff. Nothing like that.”
(Emphasis added).
Further, at pages 30 and 31 of the deposition of November 16, 1977, appears the following:
“Q What I’m asking, you say you stumbled at the site of the accident. Correct?
A Right.
Q Did you walk to the office?
A Yes.
Q Did you mention the stumble to anyone in the office?
A No.
Q Was it hurting when you were in the office?
A A little bit. Yes.
Q Did it — did the pain consistently grow over the three days?
A It was getting worse and worse.
Q You said there was a witness as to the accident. Is that correct?
A Yes.
Q Did you say anything to him at the time of the accident?
A I just said — I said like a cuss word. You know, I don’t know if he hear me or not, you know. When my leg, you know, it stay caught.
Q But previous to the site of the accident, were you walking with that witness?
A Yes.”
(Emphasis added).
At page 5 of the November 16,1977 deposition appears the following:
“Q Do you know what date the accident happened?
A Yes, sir.
Q Would you tell me that date?
A The date was January 17.
Q What year?
A 1977.
Q Do you know what time of day it happened?
A 10:30 in the morning.
Q Was it — how were the weather conditions?
A We had some thundershowers that day, you know.
Q Had it rained earlier?
*510 A I don’t know about that.
Q Could you tell me in your own words what happened? Could you tell me what the — when the LADY RAMONA docked at Bourg Drydock?
A When?
Q When.
A Well, it was on a Monday. We came to drydock it was on a Monday.”
(Emphasis added).
Then at pages 12 and 13 of the deposition of November 16, 1977; appears the following:
“Q You noted that with an X. I’ll put a circle around it and indicate site of the accident. Would you tell me in your own words — describe the accident.
A You mean where it happened?
Q Yes.
A I was walking from the drydock and went to the office and I hit a piece of iron, you know. I stumbled myself. And I—
Q You stumbled. Did you fall down?
A No. I just, you know, it was just like, you know, not fall down completely. I didn't fall down.
Q So you caught your balance?
A That’s right.
Q Did you continue to walk after that?
A Yes.
Q Did you walk all the way to the office?
A Yes.
Q Did you — -when you stumbled, did you fell any pain?
A Yes. I feel some. That’s right.
Q Where did you feel it?
A Just like a — just like you’d be like— how you call that like. I know I don’t speak too much English. I believe they call that — I sprain my foot, you know. Just like — look at that. I sprain my foot.
Q So you felt a — the pain you felt was in your foot?
A Right.
Q Or was it somewhere else?
A I believe I sprain my foot. The first thing I said it was my foot, you know. I said. Maybe it was my leg, you know. I don’t know.”
(Emphasis added).
The first doctor that the plaintiff saw concerning this alleged incident was Dr. Sidney H. Warren, Jr. who examined the plaintiff on July 22,1977. In his deposition, dated May 15, 1978, at page 6, Dr. Warren recited the history given to him by the plaintiff as follows:
“A The individual came to see me and he said that in March of this year, the year being 1977, while apparently he was working, he had some problem with his — with a knee. And he stated that it apparently was a wet day and he must have — he just said he hurt his knee. And he told me that it was— that the knee was still painful at that time. He said he had some swelling, and he still basically was complaining of some pain.”
(Emphasis added).
The plaintiff next saw Dr. Peter H. Rhymes on July 28, 1977, and the history that he gave Dr. Rhymes is found at page 6 of the deposition of the doctor taken on November 29, 1978 as follows:
“Q Did he give you a history when you first saw him of what he thought caused the problem?
A He had said that on the 18th of January, some six months prior to that, he had caught his left foot under some iron. He fell and hurt his knee and since then, he’d had pain in his knee.”
(Emphasis added).
The plaintiff then consulted with Dr. Christopher E. Cenac on August 4, 1977, and the pertinent history which was given to Dr. Cenac is found at pages 111 and 125 of the trial transcript as follows:
“Q Doctor, to save time, would you please tell the Court and the attorneys in the Courtroom the first time you saw Mr. Charpentier, the history he gave you, the times you saw him, and the treatment you afforded to him?
A Mr. Charpentier was examined 8-4-77 for an injury sustained to his left knee on 1-17-77. History relates that *511 he tripped on a piece of iron, falling and twisted his left knee.

Q Dr. Cenac, you keep using the word fall. Do you mean a fall to the ground, or a blow to the knee?
A Well, that’s the way it’s recorded in the history. It’s recorded that he tripped, then fell and during the course of falling■ twisted his knee. So, I presume he struck the ground.
Q Um, would the sumptoms that you observed at the time you began to treat the man be compatible with an injury that could have occurred, let’s say, later on in January of 1977? Could he have slipped and fell somewhere else and hurt his knee?
A Yes.
Q So when you say he fell in January of ’77, that’s based on a history that he gave you, and of course, nothing else?
A Correct.”
(Emphasis added).
At the trial, the plaintiff testified that he was walking with Glenn Pellegrin in the Bourg Drydock & Service Co. yard when he tripped on a piece of iron, stumbled, but did not fall, and twisted his knee; that the weather was pretty, but cold; that it had rained the night before; and that he said a curse word and told Glenn Pellegrin at the time and later on that day about the incident. This testimony is directly contradicted by Glenn Pellegrin who testified that he did not hear the plaintiff curse or see him fall or observe any incident on the day and time in question. The plaintiff’s trial testimony is inconsistent with that given in his deposition. In the deposition he denied reporting the incident to anyone and testified that there were thundershowers on the day in question, and that initially he thought he had sprained his foot, rather than his knee. On July 22, 1977, the plaintiff told Dr. Warren that he hurt his knee while working on a wet day in March of 1977. On July 28, 1977, he told Dr. Rhymes that he hurt his knee on January 18, 1977. On August 4, 1977, he told Dr. Cenac that he hurt his knee on January 17,1977. In his testimony at the trial and in his deposition, the plaintiff testified that he stumbled and twisted his knee, but at no time did he fall. The plaintiff told Drs. Warren, Rhymes and Ce-nac that he fell and hurt his knee.
The trial judge had an advantage that we do not have because he observed the appearance and demeanor of the witnesses at the trial. The trial judge considered their testimony and the depositions and determined that the plaintiff’s testimony was not worthy of belief, and thus failed to prove that an incident occurred as alleged. In view of the contradiction of the plaintiff by the testimony of Glenn Pellegrin and the impeachment of the plaintiff by his inconsistent statements given at trial, at deposition and to the three doctors, the trial judge was justified in reaching that conclusion. There is no ground for reversal of the trial judge’s decision. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
For the foregoing reasons, the judgment of the trial court is affirmed at appellant’s costs.
AFFIRMED.